# LEISURE RESORT TECHNOLOGY, INC. *v.* TRADING COVE ASSOCIATES ET AL.
## (SC 17427)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

22

Argued September 21, 2005—officially released January 31, 2006

*Kerry R. Callahan*, with whom was *Barbara A. Frederick*, for the appellant (plaintiff).

*Philip C. Korologos*, pro hac vice, with whom were *Hugh F. Keefe, Eric Brenner*, pro hac vice, and *Nicole M. Fournier*, for the appellees (named defendant et al.).

*Opinion*

VERTEFEUILLE, J. The plaintiff, Leisure Resort Technology, Inc., appeals from the summary judgment of the trial court rendered in favor of the defendants, Trading Cove Associates (Trading Cove), Waterford Gaming, LLC, and Waterford Group, LLC.[1] The plaintiff contends that the trial court improperly rendered summary judgment based on its conclusion that the plaintiff could not present sufficient evidence of its damages resulting from the defendants' alleged tortious nondisclosure. We disagree, and, accordingly, we affirm the judgment of the trial court.

The record reveals the following factual and procedural history. In January, 1993, an informal association of the plaintiff and three other corporations entered into an agreement with the Mohegan Tribe (tribe) to construct and manage what would become the Mohegan Sun Casino (casino). Shortly thereafter, the four entities formed Trading Cove as a general partner-

---

[1] Waterford Group, LLC, is the parent company of Waterford Gaming, LLC, which owns a 50 percent partnership interest in Trading Cove. Also named as defendants were, inter alios, LMW Investments, Inc., Slavik Suites, Inc., Lee R. Tyrol, Leonard Wolman and Mark Wolman. Those parties are not involved in this appeal. References herein to the defendants are to Trading Cove, Waterford Gaming, LLC, and Waterford Group, LLC.

ship in which the plaintiff held a 10 percent partner-
ship interest.

Approximately twenty months later, the plaintiff's
interest in Trading Cove was reduced to a 5 percent
partnership interest when a new partner was admitted
into the partnership. Subsequently, the plaintiff altered
its partnership interest again, when, in February, 1995,
the plaintiff entered into an agreement with the other
partners of Trading Cove to relinquish its 5 percent
partnership interest for a 5 percent beneficial interest
in the partnership. The beneficial interest entitled the
plaintiff to 5 percent of a partner's interest in profits,
losses, excess cash, and distributions of the organiza-
tional and administrative fees related to Trading Cove's
business with the tribe for a maximum fourteen year
period. Approximately one year prior to the plaintiff's
exchange of its partnership interest for a beneficial
interest, Trading Cove and the tribe had entered into
an agreement that granted Trading Cove the exclusive
right to manage, operate and maintain certain hotel and
resort facilities of the tribe for fourteen years (nongam-
ing management agreement). Thereafter, on August 30,
1995, the tribe and Trading Cove entered into an-
other agreement that granted Trading Cove the right
to operate, manage, and market gaming operations
at the casino for seven years (gaming management
agreement) in exchange for a percentage of net reve-
nues from the casino.

The casino opened on October 12, 1996. During the
first year of the casino's operations, the plaintiff did
not receive any payments from Trading Cove nor did
it receive information about Trading Cove's finances
that it had requested. The plaintiff thereafter filed suit
against Trading Cove to compel the disclosure of the
requested financial information. Settlement discussions
quickly ensued and focused on a sale by the plaintiff

of its beneficial interest in Trading Cove. Negotiations continued throughout the fall of 1997.

At about the same time that Trading Cove was negotiating a purchase of the plaintiff's interest, it also began negotiations with the tribe to terminate its existing agreements and establish a new agreement that would expand the tribe's gaming and nongaming facilities. In mid-July, 1997, Trading Cove made an initial proposal to the tribe for an agreement that would result in Trading Cove realizing a present value at that time of $620 million. Salomon Brothers, the tribe's investment bankers, thereafter presented a counterproposal to Trading Cove that called for: (1) the termination of all existing agreements between Trading Cove and the tribe; (2) new agreements under which Trading Cove would be the exclusive developer of new gaming and nongaming facilities, and would manage the nongaming facilities; and (3) the tribe's assumption of the management of all gaming facilities. The proposed initial term of the new agreements would be fifteen years, and Salomon Brothers estimated that they would have a present value at that time of $440 million to Trading Cove "if the aggregate facilities yield $300 million when the expansion is fully open."

On October 22, 1997, the tribe and Trading Cove entered into a memorandum of understanding similar to the tribe's counterproposal as it called for the termination of all prior agreements and the enactment of new agreements. Specifically, under the new agreements, the tribe would purchase Trading Cove's rights under the gaming management agreement for a percentage of the tribe's revenues and cash flow for seventeen years, which was estimated to have a present value at that time of $296 million. The new agreements also called for Trading Cove to provide consulting services to the tribe for two years to aid in the management of the gaming operations in exchange for fees with a

present value at that time of $11 million. Further, the new agreements would make Trading Cove the exclusive developer of the contemplated new gaming and nongaming facilities in exchange for a fee with a present value at that time of $26 million. Finally, the new agreements included a new nongaming management contract, under which Trading Cove would manage the tribe's nongaming facilities for seventeen years in exchange for a fee with a present value at that time of $127 million. The total then present value of the estimated fees to be paid to Trading Cove under the new agreements was $460 million.

In early November, 1997, Salomon Brothers sent a letter (Salomon letter) to Trading Cove's investment banker, Bear Stearns, summarizing each firm's estimate of the fees to be paid to Trading Cove under the agreements described in the memorandum of understanding. While there was a wide disparity in the value of the fees to be paid under the new nongaming management agreement, both Salomon Brothers and Bear Stearns agreed that the payments under the buyout of the gaming management agreement had a present value at that time of approximately $290 million. Both firms valued the fees contemplated under all the agreements to be worth less than $460 million, but Salomon Brothers stated that "[o]nce we have agreement on the [projected present values of each element of the deal] we will be able to adjust fees to yield $460 million of total value delivered to [Trading Cove]."

Subsequently, in mid-November, the tribe and Trading Cove exchanged drafts of the agreements proposed in the memorandum of understanding. These drafts still contemplated a buyout of Trading Cove's rights under the gaming management agreement, a new nongaming management agreement, and an agreement granting Trading Cove the right to develop a new casino, luxury hotel, and a convention and events center.

Meanwhile, on November 21, 1997, the plaintiff and Trading Cove met again to negotiate the settlement of the plaintiff's action seeking the disclosure of certain financial information regarding Trading Cove and the sale of the plaintiff's beneficial interest in Trading Cove. A settlement agreement was entered into on January 6, 1998, under which the plaintiff agreed to sell its beneficial interest in Trading Cove to Waterford Gaming, LLC, which owned a 50 percent partnership interest in Trading Cove, and consented to the dismissal of its lawsuit with prejudice. On that same date, the plaintiff was paid $5 million for its beneficial interest. The settlement agreement also provided that the plaintiff would receive an additional $2 million payment, if Trading Cove "enters into any agreement with the [tribe] pursuant to which [Trading Cove's] management or operation of, or any other involvement of any kind with, the [tribe's] gaming facilities or other related facilities or enterprises is amended, restated, extended or renewed, or if a new agreement or arrangement relating to the foregoing is entered into between [Trading Cove] and the [tribe] . . . ."

On February 7, 1998, Trading Cove and the tribe's negotiations came to fruition as they entered into agreements that provided Trading Cove with the right to develop a new casino, luxury hotel, and convention and events center, and allowed the tribe to buy out Trading Cove's rights under both the nongaming management agreement and the gaming management agreement. In exchange, the tribe promised to pay Trading Cove 5 percent of its revenues for approximately fifteen years. The agreements differed from the prior draft agreements, which had included a buyout of Trading Cove's gaming management rights and an extension, rather than a buyout, of its nongaming management rights.

During the negotiations to sell the plaintiff's beneficial interest, the defendants had informed the plaintiff that Trading Cove was "in negotiations with the tribe to extend our relationship," but cautioned that "we did not know what form it would take, and we did not know whether we would or would not be successful." In the settlement agreement, the plaintiff "acknowledge[d] that [Trading Cove and the tribe] have had negotiations concerning the possibility of extending their relationship" and "[understood] that the results of such negotiations are at this point uncertain . . . ." On March 18, 1999, pursuant to the settlement agreement, the plaintiff received the additional $2 million due because of Trading Cove's new agreement with the tribe.

Early in 2000, the plaintiff brought the present action against the defendants. The complaint alleged the following causes of action: (1) breach of fiduciary duties; (2) fraudulent nondisclosure; (3) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; and (4) unjust enrichment. The gravamen of the plaintiff's complaint was that the defendants' failure to inform it fully of the details and substance of Trading Cove's negotiations with the tribe impaired the plaintiff from properly assessing the value of its beneficial interest and, thus, prevented it from making a fully informed decision to sell the beneficial interest. Subsequently, the trial court, *Gordon, J.*, granted the defendants' motion to strike the CUTPA count.[2] Thus, only the breach of fiduciary duties, fraudulent nondisclosure, and unjust enrichment counts remained.

---

[2] The trial court also granted the defendants' motion to strike the counts alleged against an officer, director and owners of Waterford Gaming, LLC, under an alter ego theory; see footnote 1 of this opinion; and the plaintiff's demand for an accounting. The trial court denied the defendants' motion to strike the breach of fiduciary duties and fraudulent nondisclosure counts. In addition, the trial court also denied the defendants' concurrent motion for summary judgment on all counts.

The defendants then moved for summary judgment on the remaining counts on three grounds: (1) the plaintiff knew of Trading Cove's ongoing negotiations with the tribe; (2) the plaintiff, under the settlement agreement, waived its right to any further payments arising from the agreement between Trading Cove and the tribe; and (3) the plaintiff could not satisfy its burden of proving the diminution in value of its beneficial interest caused by the defendants' alleged nondisclosure. The trial court, *Alander, J.*, granted the defendants' motion on the third ground. The trial court observed that the plaintiff did not seek to rescind the settlement agreement; rather, the plaintiff affirmed the agreement and sought damages. Thus, the court reasoned that the plaintiff, under *Helming* v. *Kashak*, 122 Conn. 641, 644, 191 A. 525 (1937), had to prove "the measure of its damages for fraudulent nondisclosure [as] the difference between the price it received from the defendants for its 5 [percent] beneficial interest and the actual value of the beneficial interest at the time of the sale."

First, the trial court determined that the present case was controlled by this court's decision in *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 409, 456 A.2d 325 (1983). Applying *Pacelli*, the trial court stated that in an action for damages arising from a sale induced by a fraudulent nondisclosure, the court is forced to engage in an inappropriately speculative analysis of what terms the parties would have agreed upon if full disclosure had been made. Accordingly, the trial court determined that in the present case the actual value of the plaintiff's beneficial interest at the time of the sale is speculative because it depends on what sale price the parties would have agreed upon if the status of the ultimately successful negotiations with the tribe had been disclosed.

In addition, the trial court concluded that any claimed enhancement in the actual value of the beneficial inter-

est at the time of its sale due to the ongoing negotiations with the tribe would be insufficient to prove damages under *Helming* because any increase in value at that time was speculative. The trial court reasoned that any increase in value was speculative because at the time of the sale, it was uncertain whether the negotiations would be completed successfully, and, if so, what the substantive results would be. The trial court also rejected the plaintiff's reliance on a report by Richard A. Royston (Royston report), a chartered accountant and certified fraud examiner, submitted as evidence of the plaintiff's damages. The Royston report calculated that the plaintiff's damages, as of the end of 2003, were $15,225,000. This value was arrived at by subtracting the December, 2003 value of the payments the plaintiff received from the sale of its beneficial interest from the December, 2003 present value of the stream of payments that would have been due the plaintiff had it retained ownership of the beneficial interest over its fourteen year term. The trial court concluded that the Royston report was inappropriate evidence of the plaintiff's damages because it calculated the value of the beneficial interest as of the end of 2003, whereas the proper measure of damages sustained by a fraudulently induced seller would be calculated as of the time of the allegedly fraudulent sale. This appeal followed.[3]

As a preliminary matter, we set forth the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 6, 882 A.2d 597 (2005). The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. *Serrano* v. *Burns*, 248 Conn. 419, 424, 727 A.2d 1276 (1999). "Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, supra, 7.

The plaintiff claims that the trial court improperly granted the defendants' motion for summary judgment on the ground that the plaintiff lacked sufficient evidence of its damages. Specifically, the plaintiff contends that a jury could reasonably have estimated its damages based on the deal valuations that Trading Cove and the tribe discussed during their negotiations or, alternatively, on the Royston report. In addition, the plaintiff argues that the trial court improperly relied on *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, supra, 189 Conn. 401, because that case established an inequitable rule under which no plaintiff reasonably could prove damages in an action for fraudulent nondisclosure. In response, the defendants argue that the trial court properly granted their motion for summary judgment because the plaintiff had failed to produce sufficient nonspeculative evidence of its claimed damages. In particular, the defendants contend that, because the plaintiff has chosen to pursue a remedy of damages, rather than rescission, it must, under *Pacelli*, prove through nonspeculative evidence the diminution in the value of its bargain caused by the defendants' alleged nondisclosure. The defendants claim that the plaintiff's evidence

did not satisfy the *Pacelli* test for damages because the deal valuations were unduly speculative and the Royston report was irrelevant. We agree with the defendants that the trial court properly concluded that the plaintiff failed to provide sufficient evidence of its damages. We base this conclusion, however, on the method of calculating damages articulated in *Helming* v. *Kashak*, supra, 122 Conn. 644, and not on our decision in *Pacelli*.

We begin with a brief review of the remedies available to a plaintiff who has been fraudulently induced to enter into a transaction.[4] The two types of remedies available in such actions are rescission of the underlying contract and restitution, or affirmance of the contract and recovery of the damages caused by the defendant's fraud. See *Duksa* v. *Middletown*, 173 Conn. 124, 129, 376 A.2d 1099 (1977); *E. & F. Construction Co.* v. *Stamford*, 114 Conn. 250, 258, 158 A. 551 (1932). If the plaintiff rescinds the contract and seeks restitution, then both the plaintiff and the defendant ordinarily must restore to each other what each had received in the transaction. 2 D. Dobbs, Remedies (2d Ed. 1993) § 9.3 (3) and (4); 37 Am. Jur. 2d 366, Fraud and Deceit § 361 (2001). On the other hand, if the plaintiff affirms the contract, he or she may sue for damages while retaining any consideration that he or she had received in the transaction. 37 Am. Jur. 2d 364, supra, § 359.

---

[4] The trial court's memorandum of decision on the defendants' motion for summary judgment did not distinguish between the counts for breach of fiduciary duties and fraudulent nondisclosure. The memorandum of decision treated both counts as sounding in fraud. On appeal, neither party objected to the trial court's treatment of these two counts and their briefs failed to distinguish between the two counts. Thus, we will treat the claim as sounding only in fraud. In addition, the plaintiff did not brief separately its unjust enrichment count in this court, and, thus we consider that count to be abandoned. See *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 52, 881 A.2d 194 (2005) (declining to review claim for which no law is cited and no legal analysis is provided).

If the damages remedy is sought, pecuniary injury is a necessary element of the cause of action. See *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 329–30, 593 A.2d 478 (1991); *Beik* v. *Thorsen*, 169 Conn. 593, 594–95, 363 A.2d 1030 (1975). "Where the evidence failed to show that the plaintiff suffered any damage at the time of the transaction, under the applicable rules of law as to the measure of damages for fraud, it is held that he cannot recover in an action for deceit." (Internal quotation marks omitted.) *Beik* v. *Thorsen*, supra, 595 (affirming trial court's decision to direct verdict for defendant because there was absence of evidence that plaintiff sustained damages from alleged fraud);[5] see *Appleton* v. *Board of Education*, 254 Conn. 205, 212–14, 757 A.2d 1059 (2000) (affirming trial court's grant of defendants' motion for summary judgment because plaintiff failed to show that she suffered any actual loss from defendants' alleged tortious interference with her employment contract).

The method by which damages are measured in a fraud action depends on whether the plaintiff was a fraudulently induced buyer or seller. If the plaintiff was a buyer, courts apply the benefit of the bargain measure of damages, which is the "difference in value between the property actually conveyed and the value of the property as it would have been if there had been no false representation . . . ." *Miller* v. *Appleby*, 183 Conn. 51, 57, 438 A.2d 811 (1981); accord *Paiva* v. *Vanech Heights Construction Co.*, 159 Conn. 512, 517, 271 A.2d 69 (1970); *Morrell* v. *Wiley*, 119 Conn. 578, 583, 178 A. 121 (1935). On the other hand, if the plaintiff was a seller, courts apply the out-of-pocket measure of damages, which is "the difference between the price received by the plaintiff for the [property] and its actual value at the time of the sale." *Helming* v. *Kashak*, supra, 122

---

[5] Nominal damages are not available in a fraud action. *Kilduff* v. *Adams, Inc.*, supra, 219 Conn. 329–30 and n.16.

Conn. 644; accord *Anderson* v. *Snyder*, 91 Conn. 404, 406–408, 99 A. 1032 (1917); annot., 13 A.L.R.3d 970–73 (1967) (cases cited therein).

In the present case, the plaintiff alleges that it was fraudulently induced to sell its beneficial interest in Trading Cove, thus the out-of-pocket measure of damages is the applicable method to calculate damages.[6] Accordingly, we must determine whether the trial court correctly concluded that the plaintiff had failed to produce sufficient nonspeculative evidence of "the price received by the plaintiff for the [beneficial interest] and its actual value at the time of the sale." *Helming* v. *Kashak*, supra, 122 Conn. 644. There is no dispute that the plaintiff received a total of $7 million in payment for the sale of its beneficial interest. Thus, the focus of our inquiry is whether the plaintiff proffered nonspeculative evidence of the actual value of the beneficial interest at the time it was sold.

The plaintiff first claims that the trial court improperly concluded that a jury could not reasonably infer the actual value of the beneficial interest at the time of its transfer from the valuations of the deal that Trading Cove and the tribe exchanged during their negotiations. Specifically, the plaintiff argues that the October, 1997 memorandum of understanding and the November, 1997 Salomon letter both established the value of the deal as being worth $460 million to Trading Cove. Further, the plaintiff argues that both the memorandum of understanding and the Salomon letter contemplated that the value of the gaming management rights alone was worth $290 million. Thus, the plaintiff contends that the value of its beneficial interest as of January 6,

---

[6] This court's decision in *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, supra, 189 Conn. 405–406, 410, is inapposite to the present case because the plaintiffs in that case were fraudulently induced buyers and, therefore, the court analyzed their damages under the benefit of the bargain measure of damages.

1998, the date of its sale, was 5 percent of $460 million ($23 million), or, at a minimum, 5 percent of $290 million ($14.5 million). In response, the defendants argue that the trial court properly determined that the deal valuations were too speculative to establish the value of the beneficial interest at the time of its transfer because as of that date, the deal was still being negotiated.[7] We agree with the defendants.

Proof of damages "should be established with reasonable certainty and not speculatively and problematically." *Johnson* v. *Flammia,* 169 Conn. 491, 500, 363 A.2d 1048 (1975); 22 Am. Jur. 2d 302, Damages § 328 (2003) ("[r]ecovery of damages will not be allowed when the evidence leaves the existence of damages uncertain or speculative"). Damages may not be calculated based on a contingency or conjecture. See *Harper Machinery Co.* v. *Ryan-Umack Co.,* 85 Conn. 359, 364, 82 A. 1027 (1912). In the early case of *Lewis* v. *Hartford Dredging Co.,* 68 Conn. 221, 232, 235, 35 A. 1127 (1896), the plaintiff, in a breach of contract action, sought damages based on the difference between the actual value of its oyster beds and the projected market value of the oyster beds had the defendant not breached its contract. This court rejected this measure of damages as speculative because the projected market value of the plaintiff's oyster beds was based on the contingency of a successful cultivation of oysters in those beds. Id., 235–36.

---

[7] The defendants also claim that the plaintiff waived the argument that the deal valuations could be used to establish its damages because it failed to make this argument in its memorandum of law opposing the defendants' motion for summary judgment. We disagree. Practice Book § 60-5 provides that a reviewing court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." While the defendants correctly observe that the plaintiff did not argue in its memorandum of law that the deal valuations could be used to assess its damages, the trial court did consider such an argument in its memorandum of decision. Moreover, the plaintiff made this argument the central focus of its motion to reargue. Thus, the plaintiff's argument was raised in the trial court.

Although the plaintiff in the present case presents a seductively simple mathematical formula on which it bases its calculation of damages, the formula is inherently flawed because it relies on values exchanged as part of Trading Cove's negotiations with the tribe, which were not completed as of the date when the plaintiff sold its interest to the defendants. Cf. *First Bethel Associates* v. *Bethel*, 231 Conn. 731, 740 n.7, 651 A.2d 1279 (1995) (noting that fair market value is that which would be fixed in fair negotiations between willing buyer and willing seller). Rather, the values were subject to two contingencies: first, that an agreement would be reached and, second, that those values would be reflected in the final agreement. Neither of those contingencies had been resolved as of the date of the sale of the plaintiff's beneficial interest. Thus, the trial court correctly concluded that any enhancement in the actual value of the beneficial interest at the time of its sale due to the ongoing negotiations would have been speculative.

In an attempt to remedy this flaw in its proof of damages, the plaintiff claims that there is a genuine issue of material fact as to whether an agreement had in actuality been reached between Trading Cove and the tribe prior to the sale of the plaintiff's beneficial interest. The plaintiff claims that as of November 11, 1997, an unequivocal agreement had been reached that the deal would be worth $460 million to Trading Cove. The lone evidence for this assertion is the Salomon letter, in which the tribe's investment banker summarized the then present value of the projected fees Trading Cove would earn under the memorandum of understanding, and stated: "Once we have agreement on the [projected present value of each element of the deal] we will be able to adjust the fees to yield $460 million of value delivered to [Trading Cove]." We agree with the defendants that this letter alone does not raise

a genuine issue of material fact as to whether an agreement had been reached prior to the transfer.

Viewing the evidence in the light most favorable to the plaintiff, it can be inferred from the Salomon letter that the tribe and Trading Cove had agreed that the deal envisioned by the memorandum of understanding would pay Trading Cove fees with a then present value of $460 million. This does not lead, however, to the conclusion that an agreement had been reached between the parties. Rather, the undisputed evidence shows that such an agreement had not been reached in November, 1997, and that negotiations continued for nearly three more months before concluding in an agreement that varied from the terms of the memorandum of understanding. Specifically, undisputed testimony was proffered that the terms of the October, 1997 memorandum of understanding did not encompass a finalized deal as there were issues that remained to be negotiated. Reflecting this uncertainty, the agreement, after the parties entered into the memorandum of understanding, was described as being in a "fragile" state. Further, the defendants offered undisputed testimony that the deal was "on life support" and had fallen apart by December, 1997. Finally, when the tribe and Trading Cove met again on January 7, 1998, they discussed a proposed structure that was different than what had been envisioned in the memorandum of understanding. This new structure contemplated a buyout of all Trading Cove's management rights. An agreement along the lines of this new structure was finalized in Washington, D.C., during "marathon [negotiating] sessions all the way through the night," and finally was entered into on February 7, 1998.[8]

---

[8] The plaintiff argues that a financial analysis prepared by Trading Cove's investment banker on January 5, 1998, which contemplated a complete buyout of Trading Cove's rights, demonstrates that a deal based on this new structure had been discussed prior to January 6, 1998, the date on which the plaintiff entered into the settlement agreement. The plaintiff, however,

The plaintiff cites two cases in support of its position that it had presented sufficient evidence for a jury to determine reasonably the actual value of its beneficial interest on the date of the sale. First, the plaintiff claims that it "presented more and, more reliable, evidence of its . . . damages" than what was determined to be sufficient in *Cheryl Terry Enterprise, Ltd.* v. *Hartford*, 270 Conn. 619, 641, 854 A.2d 1066 (2004). That case is distinguishable, however, because, as an antitrust case, less rigorous proof of damages is required due to the inherent difficulty in proving lost profits in those cases. See id., 640, 648 n.18 (distinguishing nonantitrust cases on this ground).

In addition, the plaintiff relies on *Zimpel* v. *Trawick*, 679 F. Sup. 1502 (W.D. Ark. 1988), to support its position that the defendants' valuations of the deal, which it subsequently successfully completed, can be used to establish the actual value of the beneficial interest at the time of its transfer. In *Zimpel*, the plaintiff was induced to sell her mineral rights due to the defendant's fraudulent nondisclosure of the discovery of promising oil and gas wells in the area adjoining her property. Id., 1504, 1510–11. The defendant bought the mineral rights for $2000 per acre and resold them approximately two weeks later for $3300 per acre. Id., 1505–1506. In awarding damages, the court concluded that the best evidence of the market value of the mineral rights at the time of the transfer was the defendant's arm's-length resale of the mineral rights for $3300. Id., 1512. The plaintiff's reliance on *Zimpel* is misplaced because the evidence the court relied on in that case was not susceptible to the same level of speculation as the evidence in the present case. In *Zimpel*, the evidence the court employed to value the mineral right's market value at the time of the fraudulent transfer was that of a com-

---

offered no evidence showing that this analysis was ever exchanged with the tribe prior to January 6, 1998.

pleted, arm's-length transaction. Further, the transaction was entered into with the same knowledge of the prospects of the promising wells as existed at the time of the fraudulent transfer of the mineral rights. See id., 1504–1506. In the present case, by contrast, the evidence the plaintiff offered to value the beneficial interest was part of the negotiations between the parties and not a completed transaction. Further, to the extent the plaintiff argues that the values were reflected in the agreement that closed after the sale of the plaintiff's interest, the fact that the deal would later close, unlike the existence of the promising wells in *Zimpel*, could not be determined at the time of the allegedly fraudulent sale.

We turn next to the plaintiff's argument that the trial court improperly concluded that the Royston report was not appropriate evidence of the value of the beneficial interest for purposes of proving its damages.[9] In particular, the plaintiff claims that the Royston report's valuation of the beneficial interest is appropriate evidence of its damages because the plaintiff would not have sold its interest if the negotiations had been disclosed and, therefore, the measure of its loss should be calculated based on the value of the beneficial interest at the time of this litigation. In response, the defendants claim that the trial court correctly determined that the Royston report is an inappropriate measure of the plaintiff's damages because it fails to calculate damages based on the beneficial interest's value at the time of the allegedly fraudulent sale.

---

[9] Both parties incorrectly state that the trial court rejected the Royston report as evidence of damages based on the holding in *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, supra, 189 Conn. 401. Rather, the trial court rejected the Royston report because it estimated the value of the beneficial interest as of December, 2003, as opposed to at the time of the allegedly fraudulent sale, as required by *Helming* v. *Kashak*, supra, 122 Conn. 644. Further, as we have concluded previously; see footnote 6 of this opinion; *Pacelli* is not controlling in the present case.

We agree with the defendants. As we have stated previously herein, the damages incurred by a fraudulently induced seller are calculated based on the actual value of the property at the time of its fraudulent transfer. *Helming* v. *Kashak*, supra, 122 Conn. 644. Accordingly, the trial court properly concluded that the Royston report's valuation of the beneficial interest at the time of the litigation rendered the report inappropriate evidence of the plaintiff's damages under *Helming*.

The plaintiff's argument implies that an exception from our traditional measure of damages is warranted because it would not have sold the beneficial interest if the defendants' negotiations with the tribe had been disclosed fully. We disagree. To evaluate the merits of this argument, it is necessary to review briefly the distinction between the remedies of damages and restitution. "Damages are awarded to compensate the injured party for harm caused by the tort, whereas restitution is aimed at depriving the fraudulent party of benefits obtained by the tort." 1 G. Palmer, Restitution (1978) § 3.1, p. 230. A plaintiff may seek restitution if the defendant has committed a civil wrong, usually a tort or breach of contract, and the plaintiff prefers to recover the amount the defendant was enriched by her wrongful conduct as opposed to damages. D. Laycock, "The Scope and Significance of Restitution," 67 Tex. L. Rev. 1277, 1287–89 (1989); see also 1 D. Dobbs, supra, § 4.1 (1), p. 553 ("[o]ne whose money or property is taken by fraud or embezzlement, or by conversion, is entitled to restitution measured by the defendant's gain if the victim prefers that remedy to the damages remedy"). The recovery of restitution may take several forms, including the return of the specific property conveyed or the payment of the monetary value of the defendant's gain. See 2 D. Dobbs, supra, § 9.3 (4), p. 593 (noting that fraud victim who transferred property is entitled to either restitution in specie or in value); 1 G. Palmer, supra, § 3.3, p. 236 (same).

If a plaintiff was fraudulently induced to enter into a contract and seeks to recover in restitution, it must rescind the contract. See *E. & F. Construction Co.* v. *Stamford*, supra, 114 Conn. 258; 37 Am. Jur. 2d 366, Fraud and Deceit § 361 (2001). To rescind an agreement, if it is in fact subject to rescission, the plaintiff "must restore or offer to restore the other party to his former condition as nearly as possible." *Mandeville* v. *Jacobson*, 122 Conn. 429, 433, 189 A. 596 (1937). The reason for this rule is that although a seller is fraudulently induced to enter into a transaction, "the benefit transferred by the [seller] conformed to the transaction, [thus] he must in some manner eliminate the force of that transaction in order to obtain restitution, and this is done through a process courts have called rescission . . . ." 1 G. Palmer, supra, § 3.1, p. 229; see also 1 D. Dobbs, supra, § 4.3 (6), p. 614 (stating that rescission is "conceptual apparatus that leads to the remedy" of restitution because once transaction is unmade, the restoration of "benefits received under the contract seems to follow").

In the present case, because the plaintiff relies on the Royston report, which measures damages based on the value of the beneficial interest at the time of this litigation, the plaintiff is making, in effect, a claim for restitution, but without the necessarily concomitant claim for rescission. The plaintiff has not rescinded the settlement agreement and has indicated that it does not intend to do so because it seeks only recovery of damages. We therefore agree with the trial court's conclusion that the "plaintiff's disavowal of its right of rescission and its remedy of restitution have foreclosed as a proper measure of damages the current value of the beneficial interest received by the defendants."

The judgment is affirmed.

In this opinion the other justices concurred.